The opinion of the court was delivered by
Marr, J.
In September, 1873, James G. Mangham, and several others, were indicted and prosecuted for murder, charged to have been committed in 1867. Mangham and three others were arrested, and they gave their note, in solido, for 352000 iu favor of the several attorneys employed to defend them. The prosecution seems to have been without foundation, so far at least, as Mangham was concerned ; and he and his co-defendants were acquitted.
During the trial Mangham was sick ; and the judge permitted him to be kept, under guard, at the house of his friend, Thomas W. Abney, who took care of him, and hospitably entertained him and his guard.
The prosecution caused Mangham great distress, and pecuniary embarrassment; and, in October, 1873, he made a conveyance of his property to his friend Abney. This title was not recorded : Abney made no claim to the property ; and the conveyance was a mere simulation, designed to protect the property against the apprehended pursuit of creditors.
On the 18th of November, 1873, Lisso & Bro., to whom MaDgham was indebted for advances and supplies, brought suit against him,.and caused to be attached bis entire property; and, at the same time, the *349 attorneys, holders of the note for $2000, brought suit, and obtained an attachment, which was levied on the same property.
Mangham considered himself a ruined man. In his distress he called upon his friend Abney for assistance. The first idea was to have the property attached released on bond; but this would have afforded him only temporary relief, as the amount of the two debts exceeded the realizable value of the property. It was finally agreed that Abney & Love, a commercial firm, composed of Thomas W. Abney and LeanderE. Love, should assume and pay the debts, and that Mangham should convey to them the entire property, consisting of a plantation, stock, crop, implements and utensils, and a house and lot in Springville.
This arrangement was under discussion for four or five days. At length the attorneys reduced their claim to $1042, which appears to have been paid in cash, as were the clerk’s and sheriff’s fees, amounting to $90 ; and Lisso & Bro. accepted the notes of Abney & Love, one for $943 75, payable in November, 1874, the other for $443 74, payable in November, 1875. In consequence o£ these payments and assumptions, and of other advances to, and indebtedness of Mangham to Abney & Love, he conveyed to them, by notarial act of November 24,1873, for the stated price of $2690, the entire property attached ; and they gave him a counter letter, stipulating that on payment of this sum, and of all liabilities that Mangham might contract with them, they would reconvey the property to him. After this counter letter had been copied into the letter-book of Abney & Love, these words were added, at the suggestion of Love: “If the above is paid in two years from this date.”
The partnership of Abney & Love was dissolved; and, in June, 1875, Abney sold and conveyed to Mrs. M. E, Love, wife of L. E. Love, his half of all the property and assets of Abney & Love, including the property conveyed to them by Mangham.
In June, 1875, L. E. Love and J. H. Sheen formed a partnership ; and Mrs. Love conveyed to Sheen all the property and effects conveyed to her by Abney. In J une, 1877, the firm of Love & Sheen was dissolved; and Love conveyed to Sheen his entire interest in all the property and assets. Immediately after this Sheen and Julius Lisso formed a partnership, under the style of Lisso & Sheen ; and, by the written articles of partnership, Sheen brought into the new firm all the property and assets of the preceding partnership, including the Mangham plantation.
. At the date of the conveyance to Abney & Love by Mangham they had an account current with him, and they charged the amounts assumed by thein as cash. ■ The balance against Mangham, on the 19th of December, 1873, was $2607 97, and on the 4th of January, 1875, it was $1860 90. Love & Sheen, the successors of Abney & Love, continued *350 the account and dealing with Mangham ; and the balances against him were, 1 March, 1876, $1369 63 ; 11 January, 1877, $1317 78. The balance transferred to their successors, Lisso & Sheen, on the 8th June, 1877, was $1412 06 ; and the account closed 15 November, 1877, with balance in favor of Lisso & Sheen, $1547 41.
On the 1 March, 1876, Love & Sheen sold and conveyed, by notarial act, to Thomas Minter, forty acres of the Mangham land, for $232, payable in two equal installments, represented'by two notes'due 1 January, 1877, and 1878, respectively, secured by mortgage on the property. Mangham negotiated this sale. The notes were drawn to the order of Love & Sheen ; and the mortgage contained the pact de non alienando and was duly recorded.
In February, 1877, Love & Sheen sold and conveyed to James Lee, by notarial act, 200 acres of the Mangham land, for $1200, payable in three equal installments, represented by three promissory notes, to the order o£ Love & Sheen, due, respectively, 1 January, 1878, 1879, 1880, secured by mortgage duly recorded. This sale was also negotiated in part by Mangham, and he was a witness to the notarial title.
In September, 1876, Rawlins & Murrell recovered a judgment against D. EL Hayes and James G-. Mangham, in solido, for $576 76, with interest from 1872 ; and on the 1 March, 1876, they brought suit against Mangham, Abney, Love & Sheen, and Mrs. Love to have set aside, as fraudulent, the conveyance by Mangham to Abney & Love, and to subject the property to the payment of their judgment.
After this suit was brought, and for the purpose of showing possession in Love & Sheen, as Mangham testified, a contract of lease was entered into, by which they let the plantation to Mangham, except the 240 acres sold to Lee and to Minter, and Mangham gave them liis note for the rent, $500, payable November 15, 1877. The lease and note were actually executed after the first of March, but they were antedated first January to prove what was false, that they were anterior to the Rawlins & Murrell suit.
Lisso & Sheen, successors of Love & Sheen, settled the Rawlins & Murrell suit by paying the debt, less about $100. In September, 1877, they delivered the rent note, with the word “settled ” written across the face, to J. A. Mangham, son of J. G. Mangham, on his written assumption of the debt ; and on the fifteenth of November they brought suit against the Manghams, father and son, to recover the $500 for rent. They also obtained a writ of provisional seizure, which was executed at the same time that citation was served on James G. Mangham, November 17, at his domicile.
Mangham took measures promptly to meet this attack. Beginning on the day the process was served, he went about the country in com *351 pany with his son-in-law James L. Parmer, and obtained from his •creditors transfers of tlieir claims to Parmer. On the twenty-third November Parmer brought suit against him; and on the same day Mangham confessed judgment in his favor for §2-133, with interest.
The suit was based-on a promissory note to the order of Parmer for §876 52, dated January 1, 1877, which is no indication of its real date, bearing eight per cent interest: a claim of Mrs. Parmer for §320 for services rendered to her father, James G. Mangham, as housekeeper and for sewing, cooking, and labor performed, at his instance, from March 1, 1875, probably the date of her marriage to Parmer, to November, 1877 : a note in favor of Sarah A. Mangham, another daughter, for $113 10, transferred to Parmer November 19,1877 ; and sundry other debts, most of them represented by promissory notes, transferred to Parmer, from the seventeenth to twenty-seventh November, inclusive. The proof is that Mangham procured the transfers of most of these debts: that Parmer neither paid nor promised to pay any thing for them ; and that there was, in some instances, a promise by Parmtr or Mangham that the transferrers should have whatever Parmer might realize on them.
Armed with this judgment by confession Parmer brought this suit, on the seventeenth December, 1877, against his father-in-law, Mangham, Abney, Love, Mrs. Love, Lisso & Sheen, to have declared a fraudulent simulation the conveyance to Abney & Love ; and to subject the property to the payment of the judgment. It would have been a cruel assault by Parmer upon the good name and reputation of his wife’s father, and upon the peace and happiness of the entire family, if Mangham himself had not been an active aider and abetter in the whole proceeding, and “ consenting thereto.”
Without attempting a detailed statement of the pleadings and evidence, which are voluminous, we shall continue the narrative form with special reference to the material facts and issues.
It was excepted that the entire conveyance was attacked, and that Lee and Minter, to whom Love & Sheen conveyed 210 acres of the land, were not made parties. There may be some question as to the right of a creditor to attack, for simulation, without making all the persons holding titles under the alleged simulated title parties to the suit. One inevitable consequence of this omission is that the titles of Lee and Minter and their obligations, as makers of promissory notes for the price, and as mortgagors, can not be in any manner impaired by any judgment that may be rendered in the suit.
It was alleged by defendants that the suit of Parmer against Mangham was a fraudulent collusion between Parmer and Mangham. The *352 proof goes far toward establishing this defense, as a review of it will show.
In 1873, Parmer.came to Mangham’s without means or visible property, and was employed by Mangham as a laborer on the farm, his wages being $150 for the. year. It seems he continued in this service in 1874,1875, 1876, at no stipulated wages ; and in 1875 he married Mangham’s daughter. His wages for 1873 were paid ; and he says Mangham agreed to let him have part of the land for his services. In 1877 he seems to have cultivated a portion of the land on his own account. At any rate, there was no attempt to prove any consideration for the note except the wages for his services in 1874, 1875, 1876, which Mangham estimated at $250 a year. This would have been $750 for the three years. The note representing this 'is headed with the figures $876 '52. The sum written in the body of the note is “ eight hundred and fifty-two dollars.” The confession and the judgment are for the amount shown by the figures, not that written in the body of the note.
Before his marriage Parmer lived with Mangham, and after his marriage he and his wife continued to reside with Mangham, all as one family. His wife’s claim for $320 for wages as cook and servant in her father’s family is unusual and extraordinary : and it would require for its support a positive contract.
One of the • transferred notes sued on is in favor of Dr. Davidson for $140, dated November 19, transferred same day. Dz\ Davidson says Mangham, in company with Parmer, came to his house one night, and soon after they were seated, Mangham made known his business. He said : “ Doctor, I am owing you an account which I have not been and am not able to pay ; but I wish to settle it by note.” “I told him very well, and went to get my book in which I kept my accounts. While I was making up the account, before the note was written, Mangham said to me that he wished I would make it out as largo as I could conveniently. I told him I could make it out only as it was on my books, that I would not charge any more nor any less. After I made out the account I drew the note for the amount, and Mangham signed it. After he signed it he told me he wanted me to transfer it to his son-in-law Parmer, that he was about to be defrauded out of his property or something to that effect; and that the note would do him no good unless I transferred it to Parmer. I hesitated for some time before I would do so, because the request was a novel one ; but, after reflecting about it, I considered the debt a worthless or extremely doubtful one ; I complied with his request, and wrote and signed the transfer. There was no consideration for this transfer, and it was made by me to Parmer at the request of Mangham. I did not even expect ever to receive any thing for the account. I had very little if any thing to say to Parmer about *353 the matter. I have no'recollection of any thing that was said by Parmer. Mangham is the one at whose instance the note was given and the transfer indorsed. * * * I remember that he (Mangham) said that he wanted all the debts against him transferred to Parmer, that he would through Parmer in some way secure his homestead, or get his land, or secure it, or some thing to that effect.”
Another of the transferred claims is a note, favor of Kirk, for $155 70 for labor for the year 1877, dated eighteenth November. Kirk says he does not think Mangham owed him any thing but for the wages of 1877, fixed at $125. In the latter part of the year Mangham came to him and said he wanted him to sign a note. He touched the pen, and Mangham made his mark. He is illiterate, can not read or write. What he signed was the transfer, written at the same time as the note. “ Mr. Parmer never said any thing to me about the note when I signed; he has never said any thing to me about it since that time. Mr. Mangham owed me just $125 for work. It has not been paid.” This note is evidently in excess of the amount due Kirk by $30 70.
Another claim is a note in favor of Boze, dated August 17, 1877, for $120 for labor on the farm. Boze says he worked for Mangham just six months ; and when he left he owed Mangham a small account, say $15 to $20. No rate of wages had been agreed upon. In November Mangham sent to ask him to meet him at East Point. When he got there Mangham told him lie wanted to give him a note for his work, “ and that he wanted me to transfer it to his son-in-law Parmer, and that he would do right by me when I came out to see him and have a settlement. At the rate of the real value of my work Mangham owed me at the date of that note only about $70 or $75.
“Parmer was present at the conversation between me and Mr. Mangham at the time the note was given and the transfer written, but had nothing to say to me about it that I remember. Mr. Parmer never paid me anything, nor even promised to pay me any thing for the transfer of the note.”
Parmer says he had a private conversation with Boze, “ away from the presence of any other person, in regard to the transfer ;” and it was then agreed that he was to pay Boze whatever part of it could be realized. “He said nothing to me about the note being for wages that Mangham owed him. I certainly did not know such to be the case.” Now, Parmer lived in Mangham’s house, and worked on the farm from 1873 to 1877 inclusive; and if Boze really worked there on wages in 1877, Parmer must have known it. Besides, the note expresses on its face that it is for labor performed on the farm. If any thing was due Boze, which the testimony makes somewhat doubtful, the note is in excess of the true amount by from $45 to $50; and it is falsely dated *354 August 17, when it was actually made in November. If Mangham and Parmer could thus get up exaggerated claims for the purpose of assailing the title, and defeating the rights of his benefactors and friends, what liberties would they not take with dates and amounts, when arranging Mangham’s indebtedness to the members of his own family for the same purpose, and preparatory to the confession of judgment?
Parmer could not have hoped to succeed in this case without proving that his father-in-law had practiced fraud to the prejudice of his creditors ; and he charges in his petition that the sale to Abney & Love was “ a cover, and fraudulent and fictitious simulation, and was made and entered into to deceive and defraud the creditors of said J. G. Mangham, and to prevent them from exercising their rights over the property of said J. G. Mangham, and likewise for the purpose of defrauding his future creditors.” The proof satisfies us that this suit is the result of a fraudulent collusion between Mangham and Parmer ; that the whole proceeding is violative of public decency, of common honesty, of truth and justice; and that a proper disposition of the case would be to turn the plaintiff out of court on his own showing.
It is manifest that there was no fraud on the part of Abney & Love in taking the conveyance of Mangham’s property by public notarial recorded title; and in giving him the counter letter, stipulating the right of redemption. The consideration was real and meritorious. Mangham’s property was attached for debts which', with costs and interest, would have exceeded the amount for which it could have been sold at a forced sale. There were 640 acres in the plantation ; and Mangham says the land was worth about six dollars an acre. They assisted him in his hour of need and sore distress ; and they intended to hold the title merely as security for their just demands. They did not want the land; and Mangham says, notwithstanding the term of two years granted in the counter letter, that Abney & Love told him he could have ten years within which to redeem.
The form of security taken in this case, was precisely that which Abney & Love were in the habit of taking in other cases where they made advances. There is nothing illegal or immoral in this. Wolf vs. Wolf, 12 An. 529. It is hazardous to the creditor, because of the continued possession of the debtor; but it is not a fraudulent simulation, nor is it necessarily void. If Abney & Love had taken a mortgage instead of a conveyance, upon the same consideration, there could have been no question as to its validity. Practically, what difference can it make to other creditors, whether the security given to a real creditor is in the form of a mortgage or a sale ? In neither case would the secured creditor be allowed to claim the property in absolute ownership ; and, if the value of the property mortgaged or apparently sold is in excess of *355 the debt intended to be secured by it, other creditors can enforce their demands to the extent of the surplus, by judgment, execution, and ■sale.
In Williams vs. schooner St. Stephens, 1 N. S. 418, a vessel was •seized for supplies furnished. Stebbins intervened, and claimed the ■vessel as his property, he having purchased it in New York, where it went after the supplies had been furnished. The district court decreed the vessel to be his property.
The proof was that the vendor, finding himself in want of money, obtained seven hundred dollars from Stebbins, and conveyed the schooner to him as security, under an agreement that it was to be reconveyed to him on payment of the amount. This court held, Judge Martin delivering the opinion, that the contract, though in Eorm a sale, in reality was •a pledge. The judgment of the district court was reversed; anditwas decreed that the schooner be sold, and, after paying Stebbins, that the bal•ance be applied to the debts due the seizing creditors. See also opinion delivered by Judge Porter, refusing a rehearing in this case, 2 N. S. p. 22, in which the court held that the sale was merely a security, and that as such it was valid; and that the apparent vendor was still the owner, and his creditors had still the right to seize, subject to the right of the secured creditor to be paid out of the proceeds.
In Zacharie vs. Buckman a debtor sold his property to one of his •creditors for the purpose of protecting it against other creditors. It •appeared, by a counter letter, that the creditor, Woodman, agreed with • the debtor, Tanner, to reconvey the property on Tanner’s paying him a •certain sum, at a certain date, and delivering up a note of Woodman for the balance of the price. A few days after the note was given up; but the money was not paid. The suit was to annul the sale for fraud and simulation. The j udgment of the district court, which was affirmed, •annulled the sale, but reserved for the heirs of Woodman the amount due, §1200, out of the proceeds of the sale. 10 La. 308.
In Collins vs. Pellerin, 5 An. 99, it was held that a sale of movables, with the right of redemption stipulated in a counter letter, where the vendor remains in possession, is merely a security, and does not vest a title of ownership in the vendee. See to the same effect Wolf vs. Wolf, 12 An. 529.
In Gleises vs. McHatton, 14 An. 560, it was held that where the sale Is absolute, but it was really intended as security, the vendee can not arrest by injunction the seizure and sale of the property ; and that he ■should proceed by way of opposition, to claim a priority on the proceeds.
The books are full of cases in which sales have been declared simulated, and in which creditors have been allowed to seize property con *356 veyed by simulated title, as if no such title had been made; but we know of no case in which a sale has been treated and avoided as an absolute nullity where there was a sufficient consideration ; and the intention of the parties was merely to secure a just debt. Such a sale does not protect the property from seizure and sale, at the suit of creditors ; but it may give the secured creditor a right to be paid by priority out of the proceeds. To set aside a contract on the ground of simulation, it must be not only simulated, but it must also be fraudulent and prejudicial to the complaining creditor.
In one sense a writing or contract which is not, in reality, what it purports to be, is a simulation ; but if the purpose of the contract be lawful, and the consideration be sufficient to support it, though the design be not actually that which its terms import, it is not a fraudulent simulation, nor is it necessarily without legal effect.
The fact that Mangham remained in possession would be a badge of fraud or simulation; but it has no such significance when the real design of the parties is proven to have been, not to vest the ownership, but to secure a just debt. During the years 1875,1876, 1877, Mangham wrote frequently to Love & Sheen ; and whenever he had occasion to refer to the property, or to his relations to it, he called the land “ your land,” and himself "your agent.” If he possessed for them, and as their agent, the apparent contract of sale would have been, in-reality, in the nature of a pledge. His letters go far toward showing such possession and agency ; but he had the courage to testify, as a witness in this case, in behalf of his son-in-law, that these letters were written to suppor-t the original simulation, and to give a show of reality to what was merely fictitious ; and that one of them was antedated, as were the lease and note for the rent, for the same purpose.
Abney & Love adopted a novel mode of defrauding the creditors of Mangham. When his property had been seized, they released it by satisfying and paying the seizing creditors ; and when they took from him a conveyance of the same property for their security, the certificate of ■ the recorder of mortgages shows that it was free of incumbrance. When Rawlins & Murrell attacked the title, not for simulation, but for fraud, Lisso & Sheen paid the debt. The several firms, from Abney & Love down to and including Lisso & Sheen, not only saved the property from forced sale, but extended credit to Mangham for necessary supplies for the cultivation of the plantation, and for the maintenance of his family. We can not declare the contract by which the just demands of these creditors were to be secured simulated and void merely because it was not intended to convey ownership as it purports, but to secure a debt; and we think its legitimate effect is to entitle the secured creditors to bepaid by priority out of the proceeds whenever a sale shall be made at the *357 instance of other creditors. The certificate of the parish recorder shows that this- conveyance was recorded in the book of mortgages, in his office. The real nature of the contract is disclosed by the counter letter; and we see no reason why the mere form should deprive it of the effect which it was designed to have.
If Parmer had actually seized the property under execution, and the issues presented in this case had been made on the injunction or opposition of Lisso & Sheen, we might possibly have ordered a sale, reserving to Lisso & Sheen, out of the proceeds, the amount due them. But Parmer clid not seize the property; and his judgment is so manifestly exaggerated and fraudulent that we should hesitate to recognize it as valid against any other person than Mangham alone. We entertain no doubt of the right of Lisso & Sheen to proceed to enforce the mortgages given by Lee and Minter, if they hold the notes given for the price; and it is clear that they would be bound to credit the amount realized to the balance due by Mangham. On the whole our conclusion is that the plaintiff is not entitled to have the conveyance to Abney & Love declared to be void as a fraudulent simulation ; but that any judgment creditor of Mangham has a right to have the property seized and sold under execution, subject to the right of Lisso & Sheen to be paid the balance actually due them, as it might be established contradictorily, on opposition or otherwise.
The judgment of the district court declared the conveyance to Abney & Love by Mangham unreal, simulated, and without effect, reserving the rights of defendants as creditors of Mangham. This judgment is erroneous.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; that the suit and demand of plaintiff be rejected, without prejudice to his rights as a creditor of James G. Mangham, whatever they maybe; and without prejudice to the rights of defendants, or any of them, whatever they may be; and that the plaintiff, appellee, pay the costs in both courts.